PEOPLE OF PORTO RICO, Plaintiff and Appellee, *v.* LEÓN RÍOS-
MEDINA, Defendant and Appellant.

No. 2253. Argued March 11, 1925.—Decided July 24, 1925.

1. MURDER—INDICTMENT—CORPUS DELICTI. — An indictment for murder is not fatally defective because it does not state expressly that the death was the result of the wound inflicted by the accused, if it sufficiently alleges the *corpus delicti* to be proved at the trial.

2. ID.—CHANGE OF VENUE—JURY.—When in moving for a change of venue on the ground of impossibility to secure an impartial jury in the district that fact is not proved and it appears, on the contrary, that a jury could have been selected without difficulty, it can not be held that the court abused its discretion in overruling the motion.

3. ID.—WITNESS—QUALIFICATION—MINOR.—A motion to strike out the testimony of a minor on the ground that his capacity to testify was not previously investigated comes too late if made after the witness has testified. In such a case the testimony itself gives the court a basis for judging of the capacity of the witness.

4. ID.—ID.—IMPEACHMENT—SURPRISE.—When the district attorney is surprised by the testimony of a prosecution witness he may question him about his statements before a committing magistrate and the district attorney for the purpose of impeaching his testimony.

3. ID.—EVIDENCE—CORPUS DELICTI.—In a prosecution for murder the testimony of a physician regarding the cause of death is admissible when the allegations of the indictment establish the necessary basis to prove that element of the *corpus delicti*.

6. ID.—ID.—FIREARMS.—It is not error to allow a medical expert to say in the course of his testimony that he had been shown a revolver and to state in answer to a question by a juryman the calibre of the bullet which he had taken from the brain of the deceased, according to his own observation and that of the chief of police, who was present, especially in the absence of specific objection.

7. ID.—ARGUMENT—INSTRUCTIONS TO JURY.—When in the course of his argument the district attorney does not conclude a sentence expressing his opinion regarding the guilt of the defendant and the court forthwith orders that the sentence be stricken out the error, if any, is not prejudicial, especially when the charge to the jury places all matters in their true light.

8. ID.—EVIDENCE—TESTIMONY OF WIFE.—When the wife of the defendant is called as a witness in his behalf the district attorney has a right to inquire on cross-examination into matters involved in the direct examination and into the veracity of the witness.

9. ID.—ASSIGNMENT OF ERROR.—An assignment of error can not be considered when the matters involved do not appear from the record.

10. ID.—ID.—VOIR DIRE.—Questions asked jurors on *voir dire* are not a part of the evidence at the trial.

District Court of Aguadilla, Tomás Bryan, J. Judgment of conviction for voluntary homicide. *Affirmed.*

*García Méndez & García Méndez* for the appellant. *José E. Figueras, Fiscal,* for the appellee.

MR. CHIEF JUSTICE DEL TORO delivered the opinion of the court.

León Ríos Medina was indicted for murder and found guilty of voluntary homicide. Thereupon he appealed and assigns seventeen errors.

[1] The pertinent part of the indictment reads as follows:

"The said accused, León Ríos Medina, at a time prior to the find-ing of this indictment, that is, on or about one of the days of the month of December, 1922, in the ward of Piedras Blancas, San Sebastián, P. R., which forms a part of the judicial district of Aguadilla, P. R., then and there unlawfully, wilfully, criminally and with malice aforethought killed a human being named Domingo Soler by firing at him a revolver, the bullet penetrating the back of his head and passing through the left lobe of his brain from back to front horizontally at the level of the convolution of the callous membrane and lodging between the *dura mater* and the frontal bone, the said Domingo Soler dying a few minutes after receiving the said wound so inflicted upon him, the said Domingo Soler, now deceased, by the said León Ríos Medina, with the intent to kill him and without serious provocation."

It is contended that the indictment is fatally defective because it does not state "that the death of the victim was the result of the wound alleged to have been inflicted upon him by the accused." The appellant cites the case of *People* v. *Matos*, 26 P.R.R. 520, wherein this court held:

"The death and the cause thereof are the only elements which constitute the *corpus delicti*, and in order to justify a conviction these two elements of the *corpus delicti* must be proved and it must be shown then that the defendant is the person who committed the act."

The indictment charges that the accused unlawfully killed Domingo Soler by shooting him with a revolver from which the bullet penetrated his skull, Soler dying a few minutes after receiving the wound so inflicted upon him by the accused with the intent to kill him, and that is sufficient for the reason that it establishes the necessary basis for proving the *corpus delicti* at the trial. It is a matter of evi-

dence to show clearly that death was the necessary conse-
quence of the criminal act of the accused. The first error
assigned, therefore, was not committed.

[2] Nor the second. We have examined the motion for
a change of venue and the evidence introduced, consisting
only of affidavits, and are of the opinion that the district
court was justified in overruling the motion. It was not
shown in the manner required by the authorities that it was
impossible to obtain an impartial jury in the district. On
the contrary, the facts showed afterwards that a jury could
be selected without difficulty.

In the case of *People* v. *Congleton,* 44 Cal. 93, the Su-
preme Court of that State expressed itself as follows:

"The only other point relied upon arises upon the denial of the
motion made by the prisoner to remove the action from the County
of Humboldt, where the indictment was found, on the ground that
a fair and impartial trial could not be had therein. The statute
provides that *if the Court be satisfied* of the fact that a fair trial
cannot be had, it shall order the action to be removed to a county
free from the like objection. The allowance or refusal of an appli-
cation to change the place of trial in a criminal case has always been
held largely discretionary in the Court—the motion is addresed to
its sound discretion and to be disposed of in furtherance of sub-
stantial justice. (*People* v. *Fisher,* 6 Cal. 154).

"In this case the affidavits upon which the motion was based were
exceedingly unsatisfactory; they, in the main, set forth merely that
in the belief or opinion of the affiants the prisoner could not have
a fair trial, owing to the popular prejudice against him. It seems,
too, that no difficulty was found in obtaining a jury wholly free from
bias or prejudice against the prisoner; and, under the circumstances,
we cannot say that the Court abused its discretion in denying the
motion."

In many cases this Supreme Court has considered the
circumstances that must attend the granting of changes of
venue. The question was discussed somewhat fully in the
recent case of *People* v. *Collazo,* 33 P.R.R. 48, which also

came up from the district of Aguadilla and in which a change of venue was moved for on the same ground.

[3] The 3rd, 4th and 5th assignments are as follows:

"3. The court erred in allowing the district attorney to ask witness. Ramona Irizarry whether after hearing the shot she had seen her grandfather, the defendant.

"4. The court erred in sustaining the question of the district attorney to Ramona Irizarry as to whether after her godmother came the defendant had remained in the hammock.

"5. The court erred in refusing to strike out the testimony of Ramona Irizarry."

The facts occurred as follows:

"Ramona Irizarry testifies under oath on examination by the district attorney that her name is Ramona Irizarry; that she is twelve years old and lives in San Sebastián; that her grandfather is León Ríos, the defendant (pointing him out); that her grandfather lives in Piedras Blancas, a ward of San Sebastián; that she knew a boy named Domingo Soler; that the last time she was in her grandfather's house was on the day of the occurrence under consideration; that she was in the living-room of the house and Monserrate Lebrón was there also; that her grandfather was upstairs asleep in the hammock; that her grandfather was in a room and she and Monserrate were in the living room; that the people took the horse and commenced to swear under the house; that the one who began the swearing was Domingo Soler, saying: May lightning strike the mother and father of the one who hurt my horse; that her grandfather called Soler upstairs and he went and then her grandfather beat Domingo; that Domingo did nothing and thereafter her grandfather asked for a rope with which to tie him, but her godmother asked him to let him alone and he did, and when the boy went down he called her grandfather an old dog and dared him to come down, saying that he would kill him; that thereupon her grandfather went after Domingo; that she saw him going after Domingo with a revolver and saw when upon arriving at the gate he shot Domingo; that when she heard the shot she went where her godmother and the two girls were; that when she heard the shot she ran back; that her godmother is Paca Soler, the wife of her grandfather; that on the next day her grandfather said nothing to her.

"When the district attorney asked the witness whether she saw

her grandfather after the shot the attorney for the defendant objected
on the ground that it was a leading question. The court admitted
it, the attorney took exception and the witness replied in the af-
firmative.

"The witness then testified that after the shot she saw her grand-
father in the hammock and the witness and her godmother remained
in the kitchen; that after a little while her godmother went up-
stairs, but did not say or do anything; that her grandfather remained
in the hammock and said nothing.

"District attorney: After your godmother came did he remain
in the hammock? Counsel for the defendant objected on the ground
that it was a leading question, the court admitted it and the witness
answered in the affirmative. The defendant took exception. The
district attorney then asked her: How many shots did you hears
The defendant objected on the ground that it was a leading question,
saying that nothing had been said yet about shots. The court ad-
mitted the question and the defendant took exception. The witness
answered that she heard only one; that there was a dog in the
house upstairs in the kitchen; that she did not hear any dog bark-
ing under the house; that no shots were fired at any dog; that
no other shot was heard there.

"On cross-examination by attorney J. B. García Méndez the
witness testified that she knows that León Ríos ran after Domingo
because he was swearing while her grandfather was lying in the
hammock; that Domingo is the deceased; that she did not see her
grandfather run after him; that he was walking and not running;
that he carried the revolver in his hip-pocket; that the revolver was
neither large nor small; that she does not recollect whether it was
white or black, but she saw it; that the revolver was loose in his
pocket; that the butt of the revolver was visible and it was black
and white; that she does not remember whether it had any other
color, but knows that it was white and black; that she is sure that
it was a revolver; that when she saw her grandfather running she
was in the living-room; that he was walking and not running; that
he went down the stairs and the witness remained in the living-room,
in the dining-room, in the living-room under the lamp; that the
lamp is in the center of the room; that the witness was sitting on a
chair and Monserrate was in the dining-room, but the place where
she was could be seen; that when her grandfather went away she
had already gone; that Monserrate was in the living-room after her
grandfather came: that after hearing the shot she went to where

her godmother was; that she heard the shot fired from the gate; that she was in the living-room and heard a single shot: that she knows who fired it, but did not see him when he fired it; that she saw him with the revolver and he fired the shot; that she knows because she saw it; that she saw him at the gate and she was near the balcony door; that then she was not under the lamp, but went there afterwards; that she was sitting there near the lamp and got up and went to the balcony door; that this was about seven o'clock; that it was dark already; that there was no light downstairs, but it was possible to see because it was not very dark; that she saw the firing of the revolver.—Counsel: Do you know in what direction and at whom he fired the shot? The witness did not answer.—Counsel: So you do not know positively at whom the shot was fired? Witness: The boy was running in front, but I do not know at whom the shot was fired and heard no moans.—That when she heard the shot she was in the living-room sitting on a chair near the lamp; that the report was not very loud; that she was sitting in the living-room when she heard the shot, but from there it is possible to see; that the chair was near the lamp with its back toward it and the witness was looking toward the balcony; that the house is a one-story house, but is built high and there is a long staircase; that the staircase is situated at one end of the balcony; that while coming up the stairs it is possible to see the front of the house; that her grandfather, after firing the shot, came up about half an hour later; that the witness went where her godmother was, remained there about two hours and did not go out during that time; that she was in the kitchen with her godmother, the kitchen being on the side next to the coffee grove; that from there it is possible to see backward and also forward; that the kitchen also overlooks the road, but from there it was not possible to see the place where her grandfather must have been; that she did not leave the kitchen, but her godmother came toward the front; that while she was in the kitchen she was near a window looking toward them and nothing else; that during the said two hours she saw nothing else; that about two hours thereafter her godmother came toward the front and she did so too; that she left the kitchen when her godmother came out; that this was after she set the supper; that during the two hours that she remained in the kitchen she did not come out into the living-room, but only to the window of the kitchen; that she came about one hour thereafter; that during one hour she did not leave the kitchen, or rather, she left in a short time, came toward the front

and then went back; that she went out and in; that after having gone into the kitchen she saw nobody, as she did not go into the living-room or inside of the house, but saw only her godmother and the girls Juanita and Josefa who were in the kitchen and nobody else; that she saw León Ríos, her grandfather, after he was upstairs; that she had been in school up to the third grade; that the distance at which her grandfather was when he fired the shot was short, about from here to there (pointing); that there was the balcony and there her grandfather was when he fired the shot.

"Questioned by the court, the witness replied that what she had said might have been there was a gate where he was standing; that from there he fired the shot; that she saw him from the living-room where she was sitting.

"On examination by the district attorney the witness stated that she did not see Domingo again, because they left at night; that she has no watch and never has had one; that on that night she slept at her home.

"Counsel: I move to strike out the question and the answer, for the district attorney can not ask new questions now, but only questions about matters of the direct examination.

"District attorney: I withdraw the question and the answer and have finished with the witness.

"Attorney Manuel A. García: I move to strike out the entire testimony of the witness on the ground that she has testified that she is twelve years old and in accordance with the law when a witness is under fourteen years of age in order that his testimony may be admitted in evidence it is a requisite *sine qua non* that the capacity of the witness be proved. As the witness says that she is twelve years old and the necessary questions were put to her to ascertain whether she is qualified to testify, in accordance with the mandatory provisions of the law her testimony is as if it had not been given and should be stricken out in its entirety.

"District Attorney: I object, first, because the law fixes the age at ten years and, second, because the motion comes too late.

"Judge: The court rules as follows: The determination of the capacity of a witness is a matter in the discretion of the court and that capacity is determined according to the manner in which the witness testifies.—The objection could have been made at the beginning and, of course, can be made now also, but after having heard the testimony of the witness the court is satisfied that she has capacity.

to testify; therefore, the motion to strike out her testimony is overruled.

"Counsel: The defense takes exception to the ruling of the court on the following grounds: In accordance with Jones on Evidence, in order that the testimony of a witness under fourteen years of age may be admitted it is indispensable that his capacity to testify be established; that the question having been raised upon the termination of the testimony of the witness in accordance with law, and her capacity not having been proved at any time in a specific manner, her entire testimony should be stricken out; that the question raised is not one within the discretion of the court, but the provisions of the law are mandatory and imperative, and that such elimination should have been granted without taking into account the conclusion which the court may have reached in view of the testimony, of her manner of testifying and of other circumstances, because it has no bearing in these cases when the law is mandatory.—We submit also as authority the case of People v. Rivera, 12 P.R.R. 386, for although in that case it was held that as the witness was under ten years of age it was necessary to prove his capacity, this does not exclude the mandatory language of the law which provides that if the witness is under fourteen years his capacity must be fully shown before his testimony is admitted or before a motion to strike it out is ruled on."

We have transcribed the entire testimony and incidents so that the facts may speak for themselves. We think that it can not be concluded that the questions objected to were leading, and it is evident that the objection that previous inquiry was not made as to the capacity of the witness was raised too late. When the objection was made the court had ample grounds for judging the capacity of the witness and correctly ruled that she was capacitated. It is hardly possible that an adult could have testified more clearly, precisely, and consistently than did the girl Ramona Irizarry. See the case of *People* v. *Párquez*, decided today (*post,* page 538).

[4] The 6th and 7th assignments are as follows:

"6.—The lower court erred in permitting witness Monserrate Lebrón, on examination by the district attorney, to state when,

prior to a certain date, she had been in the house of León Ríos for the first time.

"7.—The district court erred in allowing the prosecuting attorney to impeach the veracity of his own witness, Monserrate Lebrón."

The testimony of Monserrate Lebrón, defendant's daughter-in-law, covers seven pages of the transcript and it would unnecessarily lengthen this opinion to copy it. She began by reciting the facts in harmony with the Irizarry girl's version, but in answer to questions by the attorney for the defense she testified that when the defendant left the house he was not carrying a revolver and that he fired the shot from upstairs upon hearing the barking of a dog. The district attorney then expressed surprise and for the purpose of impeaching her testimony, as he said, asked the witness the question objected to and questions with regard to other statements made by her in the presence of the municipal judge and the prosecuting attorney himself.

It is our opinion that there was no ground for the objection. The question was admissible. And in accordance with the statute cited by the appellant (sec. 159 of the Law of Evidence) and especially with section 243 of the Code of Criminal Procedure, which is directly applicable, the prosecution laid the foundation for the impeachment.

In the case of *People* v. *Colón*, 25 P.R.R. 586, this court said:

"Appellant also complains of error in permitting a witness to testify as to what the injured woman told the municipal judge. The injured woman denied having told the judge that defendant had beaten her. Without any attempt to show that the Government was surprised by her testimony, this impugning evidence was introduced. We have commented on this class of procedure unmistakably in the case of *People* v. *Rojas*, 16 P.R.R. 238, and yet neither the judge of the court nor the parties to this case seem to be aware of it. And a similar pronouncement was made in *People* v. *Ramírez de Arellano*, *ante*, p. 243. The Government may not introduce

a witness and, without showing surprise, bring incriminating hearsay evidence before the court under the guise of contradiction.''

As may be seen in the *Colón Case* and those cited therein, the prosecution failed to lay a foundation for the impeachment by pleading surprise while in the case at bar it did.

We shall return to the testimony of Monserrate Lebrón in making an analysis of the evidence.

[5, 6] Assignments 8, 9 and 10 relate to the expert testimony of Dr. Rodríguez Cancio and are stated as follows:

"8.—The lower court erred in permitting Dr. Miguel Rodríguez Cancio to testify as to what caused the death of Domingo Soler, that being a matter not expressly alleged in the indictment.

"9.—The court below erred in allowing the district attorney to question the medical expert as a firearms expert when he himself said that he was not qualified to testify as such.

"10.—The lower court erred in allowing the district attorney to ask the witness whether there were any bullets or revolver cartridges in the house of León Ríos Medina."

After what we have decided in considering the first objection raised, logically we must conclude that the eighth assignment of error is without merit.

As regards assignments 9 and 10 it will suffice to say that nothing shows that the testimony of the medical expert entered the field of ballistics. After the witness had testified without specific objection that Soler died as the result of a wound in the brain caused by a bullet that entered the occipital region, crossed the left lobe of the brain and lodged in the *dura mater* of the frontal bone; that the bullet entered the back of the skull and continued its way through horizontally, and that the shot was fired from behind, he was asked whether he was shown a revolver in the defendant's home when he went there to examine the dead body of Soler, and he answered in the affirmative. We think that this question could have been answered by any person not an expert in firearms, and also the question asked by one of the jurors in relation to the calibre of the bullet

extracted by him from Soler's brain, particularly when the answer was as follows: "That he believed that the bullet extracted was calibre nine, but as he was not sure about his opinion because he was not an expert in ballistics, when he was going to deliver the bullet to the judge he consulted the chief of police who agreed that it was calibre nine." It should be stated that with regard to this last statement there is no specific objection in the record.

[7] The eleventh assignment, the only one that the *fiscal* considers of importance as a basis for the reversal of the judgment, was stated as follows:

"The court below erred in permitting the district attorney to say, while witness José Antonio Vargas was testifying, THAT HE WAS ABSOLUTELY CONVINCED OF THE DEFENDANT'S GUILT AND THAT HE WOULD NOT REST UNTIL THE SAID DEFENDANT WAS IN THE PENITENTIARY, ETC."

This assignment should be considered together with the 15th, stated in the following manner:

"The court below erred in not giving specific instructions to the effect that the jury should not consider the improper testimony given by witness José A. Vargas, Municipal Judge of San Sebastián."

In order to judge of the merits of the question raised we are obliged to copy again extensively from the record by transcribing the whole testimony of José Antonio Vargas. It is as follows:

"In answer to questions asked by the district attorney he said that his name is José Antonio Vargas; that he is the Municipal Judge of San Sebastián and knows defendant León Ríos Medina; that he had to act in his official capacity in a matter concerning the defendant on December 28th. When requested by the prosecution to explain to the jury his action in the matter he said that on December 28th of last year he was notified as Judge of the Municipal Court of San Sebastián . . . Defendant's counsel, J. B. García Méndez, objected to testimony about what he was notified of, saying that he should limit his testimony to his action in the matter.

The court ruled that the witness might lead up to his explanation in that way and the ruling was excepted to by the defendant's counsel.—The witness then testified that on December 28th of last year, as Municipal Judge of San Sebastián, he was informed that a dead body had been found in the ward of Calabazas of San Sebastián, whereupon he went there and saw the dead body of Domingo Ríos or Domingo Soler.—The district attorney asked the witness whether León Ríos admitted at any time that the dead body was that of Domingo Soler and the attorney for the defense objected to the question on the ground that it was inadmissible because this was an improper way of bringing before the court an admission of the defendant. The court admitted the question and the defense excepted.—The witness answered that he admitted it; that he, the witness, talked with the defendant; that the witness found the body; that when he arrived at the house of José León Ríos the latter personally took him to the place where the body was lying; that he found the body in a horizontal position, in *rigor mortis*, with his hands carefully placed on his chest as when a dead body is placed in a coffin; that the body was lying in a ditch which was a little wider than the body of the deceased Domingo León Ríos and, as the ditch was sloping, the head was lower than the body; that he found the body in that position; that he does not know in what direction the deceased was looking because the eyes were nearly closed, but the body was lying on its back with the hands on the chest; that he left the body as he found it and went to the house where he had a long conversation with José León Ríos in an attempt to ascertain who had killed his son and the motives for the crime; that the witness then sent the marshal, if he remembers correctly, to look for Dr. Miguel Rodríguez Cancio and the dead body remained in the same place until the doctor arrived; that in the meanwhile the witness continued his investigation by questioning different persons, and especially León Ríos, in order to discover who had killed his son; that the witness seized a revolver in the house.—Defendant's counsel requested the court to order a preliminary inquiry as to the description of the firearm before it was offered in evidence and the court ordered the district attorney to examine the witness on that point.—When questioned by the prosecution the witness answered that he siezed a nine millimetre revolver which was somewhat old and a little rusty; that that was the only description he could give of the revolver because he was not a firearm expert; that two cartridges of the revolver had been

fired and it contained three that had not been fired; that the re-
volver was handed to him by the defendant's wife in the house of
León Rios; that it contained two cartridges that had been fired
and three that had not; that there were three cartridges with lead
in their shells and two empty shells; that two cartridges had been
fired; that he touched them and the powder stained his fingers;
that the defendant was present when the revolver was handed to
the witness; that the chief of police of San Sebastián was in the
house; that he does not remember where the revolver was; that
what is shown him is the bullet; that he had seen the same bullet
before because Dr. Miguel Rodríguez Cancio delivered it to the
witness.

"On cross-examination by Manuel A. García, attorney for the
defense, the witness testified that he was the Municipal Judge of
San Sebastián; that the firearm identified by him was voluntarily
delivered to the witness; that he had to ask for it and it was de-
livered to him without any objection; that he remembers perfectly
that there were two cartridges that had been fired and three that
had not; that on the day that he examined the revolver he smelled
the shells of the two cartridges and concluded that they had been
fired recently; that the two shells were in the cylinder of the re-
volver.—Counsel asked the witness whether as Municipal Judge of
San Sebastián he was greatly interested in this case and the witness
answered in the affirmative.  Counsel: When I asked you this ques-
tion I expected a complete answer, without any subterfuge or hesi-
tation.  Under the law I have a right to expect such an answer and
if the witness answers the question categorically I shall be satisfied.
—The district attorney objected to the statement on the ground
that it was unfair to the witness who had a right to explain his
answer.—The judge intervened and said: When the district at-
torney requires a question to be answered categorically the attorney
for the defense objects on the ground that the question is leading,
and now the defense is asking a question considered by lawyers as
suggestive and he requests the witness to answer it within his sug-
gestion!—Defense: We are cross-examining the witness and the
rule is inapplicable in cross-examination.—Judge: Any condition
imposed upon the witness' reply is void.

"The witness continued as follows: That in this case he had
the same interest as in all other cases wherein he acted as judge
and as a citizen, that is, to see that strict justice is done in every
way.—Defendant's counsel: In this particular case did the witness

at any time make statements to the effect that he had an absolute interest in the matter and would not stop until León Ríos was sent to the penitentiary? Did the witness say that? Under the oath taken and as a gentleman of honor, has the witness stated that he would not rest until this defendant went to the penitentiary? Witness: I have said it in public and have written it in a valient and gentleman-like way to the Attorney General, because I am absolutely convinced . . . Counsel: That is not my question. Has the witness or has he not stated that he would not rest until the ac-cused in this case is sent to the penitentiary?

"District attorney: I believe that the witness has a perfect right to explain what he said or did not say and why he said it if he did.

"Counsel: I asked him if he had said at any time that he would not rest in this case until this man was sent to the penitentiary and the witness must answer yes or no.—District attorney: The witness replied that he did say it in writing, and I say that I will not stop until this man, who I am absolutely convinced committed the crime . . .

"Judge: The statement made by the district attorney must be stricken out because he can not talk in that way before the jury.

"Defendant's attorney: The ruling of the court is just and I respect it, but I must say that the district attorney has said before the jury in open court that he is absolutely convinced of defendant's guilt and that he will not stop until this man goes to the penitentiary. We take exception to these statements of the prosecuting attorney on the ground that they are abusive, arbitrary and contrary to law and all professional ethics.

"District attorney: The prosecuting attorney is the representative of the People and must see that justice is done; he would not be complying with his duties as such if after an investigation that discloses the commission of a crime he did not use all legal means available to secure a trial of the defendant by an impartial jury. The district attorney would never have brought this defendant before a jury if he had not believed that a crime had been committed and that the guilty one is the defendant, who is being tried on an indictment of a grand jury.

"Judge: The court rules that the witness may answer the question and give the necessary explanations to make his reply intelligible.

"Defendant's counsel: My question is, has Judge Vargas, the witness, stated at any time or on any occasion that he would not

rest in this matter until he had succeeded in sending the defendant to the penitentiary? Has he stated that or has he not?

"Witness: The attorney appeals to me as judge and gentleman, consequently I must defend my honor by explaining my answer so as to make my position clear before the court, the jury and the public. I have said in a valient and gentlemanly way that my conviction of the guilt of this defendant is absolute and that I have a right to reach that conclusion on my own opinion as a lawyer and as a citizen, and nothing prevents me from repeating here what I have said in different places, among friends; I never retract what I say; I have treated this defendant with strong hands because this man has already been in the penitentiary . . . .—Attorney: I move that the statement be stricken out.—Prosecuting attorney: No objection.—Judge: The court orders that the last part of the statement be stricken out.—Defendant's counsel: I also move that the court instruct the witness that he must answer the questions without touching matters that are either untrue or inadmissible and merely tend to impress the jury.—Question: Did the witness at any time say that he would not rest until he had put this man in the penitentiary?—District attorney: I object because that is not the proper way of impeaching the testimony; the question must inform the witness as to when, where and before whom he said this or that.

"Defendant's counsel: I am not impeaching the veracity of the witness; the question has been admitted by the court.—Judge: The witness should answer the question without expressing his personal opinion, but he can explain his attitude without giving any opinion with regard to the defendant.—The witness then replied that he referred to a fact that appeared in the record and said that he would give a concrete answer and then explain it; that he did say that in more than one place, and that he said it because after having personally made a careful investigation of the case he reached the conclusion . . . Defendant's counsel: I object to the conclusions at which the witness may have arrived. The defense is satisfied with the answer and does not desire any other comment.—Judge: The witness may testify without expressing his opinion.—Witness: I made the statements in my official capacity because I considered it my duty as a loyal servant of the Government of Porto Rico.

"Attorney for the defense: For the last time, did the witness say on any occasion that he was enraged against the defendant in this case and that if a change of venue was made to a district other

than Aguadilla he would make a campaign against the accused in the newspaper *El Mundo?* Did you say that or did you not? Did you say that you were enraged against this defendant, or did you not, and if you did, explain whether you said that if this case was taken to another district you would make a campaign in the newspaper *El Mundo* to create a feeling against the defendant?

"District attorney: I object; the attorney must say where, when and before whom the statement was made; whereupon the question was put thus: When this case of León Ríos was submitted to the grand jury did you say in the clerk's office of this district court that you were enraged against the defendant and that if the case should be transferred to another district you would make a campaign in the newspaper *El Mundo* in order to create a bad feeling against the accused so that he would be convicted? Did you or did you not say that in the clerk's office of this district court and in the presence at least of my brother and other persons on the day this case was submitted to the grand jury? The witness is a gentleman and that is enough. Witness: I am going to reply to the whole question because I never deny what I say; I assume all the responsibility and as a gentleman I will testify to nothing but the truth. While in the clerk's office of this court, and in the presence of Mr. García Méndez and other gentlemen whom I do not want to mention, I made the statement that I was prejudiced against the defendant; but I do not remember having said that I was going to make a campaign against León Ríos, I do remember that I told my colleague, Juan Bautista García Méndez, when we were alone that if the case was transferred for trial to another district I would start a campaign against José León Ríos Medina by publishing his past history. That was confidentially said to Mr. Juan Bautista García Méndez in San Sebastián.

"Cross-examined by the prosecuting attorney, the witness testified that he made the preliminary investigation in the case; that the time that elapsed since the commission of the crime charged to the defendant is the time that had elapsed since the 28th of December of last year; that he handed the bullet to district attorney José Julián Acosta; that that is the same bullet which Dr. Cancio delivered to the witness.—The prosecuting attorney offered in evidence without opposition three cartridges and two empty shells and the court admitted them."

In support of the assignments analyzed the appellant

cites the case of *People* v. *Machado,* 31 P.R.R. 39, and from Cyc. and Ruling Case Law.

In *People* v. *Machado* this court held:

"Before one of the witnesses for the defendant commenced to testify the attorney for the defendant asked the jury to pay attention to the testimony of the witness because he was with the defendant before the homicide was committed. The district attorney replied as follows: 'I announce that this witness is a perjurer and that I have sent for the foreman of the grand jury so that you may know what he testified to before that body.' *Held:* That it was prejudicial error not to stop the statement of the district attorney, or at least instruct the jury positively not to consider it in determining the credibility of the witness, especially when no evidence was offered to attack his credibility."

Cyc. condenses the jurisprudence as follows:

"It is reversible error for the prosecuting attorney in his argument to the jury to declare his individual opinion or belief not expressly stated to be on the evidence that the accused is guilty, or to state that defendant's counsel advised him to plead guilty. He may, however, argue to the jury that the evidence in his opinion shows guilt or that it convinces him of the guilt of the accused. Such argument will not necessitate the granting of a new trial." 12 Cyc. 580–81.

And Ruling Case Law says:

"The personal opinion of the prosecuting attorney as to the guilt of the accused is not evidence, and the sanction of such an opinion by the court is serious error." 2 R.C.L. 415.

We have considered the facts in the light of the jurisprudence cited by the appellant and are of the opinion that no fundamental error requiring a reversal of the judgment has been committed. There is no doubt that the municipal judge went beyond formal compliance with his duties in his investigation and statements, going so far as to be passionate; but we do not believe that the jury were improperly impressed by his attitude. On the contrary, it could

have produced an opposite result in the minds of the judges of the facts.

As regards the statements made by the district attorney it does not appear that he finished his thought and in any event the court immediately ordered them to be stricken out.

The case of *People* v. *Machado, supra,* was different. It was a case wherein the credibility of a witness was impeached by the sole statement of the district attorney that he was a perjurer.

We believe that if there was any error it was not prejudicial and the following instructions given by the court to the jury cleared the situation and can be considered sufficient:

"The statements of counsel, both for the prosecution and for the defense, are not evidence in the case and should not be considered by the jury in their deliberation upon a verdict.

"In this particular case the court wants to call the attention of the jury especially to the fact that both the defendant's counsel and the district attorney in the discharge of their sacred duties went so far as to make statements to which the court had to call their attention, as now in its instructions it calls your attention to the fact that the statements made by the attorneys in their arguments must not be taken into consideration by the jury, because they are not a part of the evidence, but merely proof that the attorneys were trying to show beyond reasonable doubt that they were complying with their respective duties."

*     *     *     *     *     *     *

"Gentlemen of the jury, the court instructs you that any opinion expressed by the attorneys in the course of the trial should not be considered by you."

[8] Assignments 12 and 13 are stated as follows:

"12.—The court erred in permitting the district attorney to cross-examine the wife of the defendant as to who was the mother of Domingo Soler.

"13.—The District Court of Aguadilla erred in allowing the prosecuting attorney to cross-examine the defendant's wife, Fran-

cisca Soler, who was called only as an impeaching witness, on matters that could prejudice the rights of the accused.''

The incident covers more than four pages of the record, but it can be summarized as follows: Defendant's wife was called as a witness for the defense and when the district attorney began to cross-examine her the defendant's counsel objected. It was claimed that the accused had given his consent and the defense replied: ''The defendant consented that she testify in his favor, but not against him.''

This is enough to warrant the conclusion that no error was committed in allowing the cross-examination. After the witness had been called by the defense the district attorney had a right to examine her on facts covered in her direct testimony and to test the veracity of the witness.

[9] The fourteenth assignment of error is that—

''The court erred in not permitting the defendant's counsel in his arguments to the jury and to show the necessity of clear proof for conviction, to cite a famous case tried in Paris.''

In connection with this assignment the record shows only the following:

''While arguing the case to the jury counsel attempted to cite a certain case recently tried in Paris, to which the district attorney objected. The court sustained the objection and the ruling was excepted to by the defense.''

It can be seen at once that there is no basis for discussing this.

[10] Assignment 16 is stated as follows:

''The court erred in refusing to give the following instructions to the jury: The court instructs the jury that in considering the evidence in the case they should disregard absolutely the past history of the accused and that his past life should not in any way influence their verdict.''

The court refused to give that instruction ''on the ground

that the defendant's past life had not been a matter of evidence."

In his argument the appellant's attorney mentions three times when something was said in connection with his past life—twice when the jury was being impaneled and the third time when witness Vargas was testifying. The questions asked jurymen on *voir dire* are not a part of the evidence, and what was said by witness Vargas was stricken out on motion of defendant's counsel and without opposition from the district attorney.

The last assignment, No. 17, attacks the sufficiency of the evidence. We have transcribed the most important testimony. It constitutes a complete and direct charge. The defense unsuccessfully tried to contradict it with the testimony of the defendant's wife and daughter-in-law, who testified that the girl was in a place in the house from where it would have been impossible for her to see the shooting, and that the grandfather of the girl was not carrying a revolver when he left the house. The jury believed the whole testimony given by the girl, and all the evidence admitted in connection with the revolver that was seized, the place where Soler's body was found, the wound inflicted upon the deceased and the bullet that was extracted from his skull, the quarrel that took place; everything, we repeat, shows that she spoke the truth.

The judgment appealed from must be affirmed.